**SIEMENS AKTIENGESELLSCHAFT, Plaintiff,**

v.

**BELTONE ELECTRONICS CORPORATION, Defendant.**

**No. 73 C 296.**

United States District Court, N. D. Illinois, E. D.

Sept. 12, 1974.

See also D.C., 370 F.Supp. 970.

John D. Simpson, Hill, Gross, Simpson, VanSanten, Steadman, Chiara & Simpson, Chicago, Ill., for plaintiff.

Sheldon W. Witcoff and Charles G. Call, Molinare, Allegretti, Newitt & Witcoff, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

This is a patent infringement action by Siemens Aktiengesellschaft ("Siemens"), a German corporation, against Beltone Electronics Corporation ("Beltone"), an Illinois corporation and manufacturer of allegedly infringing hearing aids.[1] The patent in suit, U.S. Letters Patent No. 3,209,080, describes a hearing aid worn behind the ear having a frontally-directed microphone or sound opening. The patent originally was held by Siemens Reiniger Werke, which, on October 1, 1966, transferred all of its assets, including patent rights, to plaintiff.[2] The matter is presently before the court upon defendant's motion, pursuant to Rule 56(b), F.R.Civ.P., for summary judgment dismissing the action on the ground that plaintiff is barred by the doctrine of laches from enforcing its patent rights against defendant.

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P.

The undisputed facts, or, at least, the facts assumed to be true by the parties for purposes of this motion, are as fol-

1. Also originally named as parties defendant were Sonotone Corporation, a New York manufacturer of hearing aids, and Sonotone Corporation of Chicago, a distributor of hearing aids. A previous order of this court transferred the action against Sonotone Corporation to the U.S. District Court for the Southern District of New York and stayed further proceedings here against Sonotone Corporation of Chicago. Sonotone Corporation subsequently entered into a royalty agreement with Siemens and the suits against these defendants were dismissed.

2. Since there can be no question that plaintiff must accept the prior conduct and knowledge of Siemens Reiniger Werke as its own, cf. Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1377 (7th Cir. 1972); George J. Meyer Co. v. Miller Mfg. Co., 24 F.2d 505, 506 (7th Cir. 1928), plaintiff and Siemens Reiniger Werke hereafter sometimes will be referred to collectively as "Siemens".

lows. In May, 1961, Siemens Reiniger Werke filed a patent application in Germany pertaining to the subject matter of the patent in suit. The following month that company filed a corresponding U.S. patent application. After a four-year prosecution before the U.S. Patent Office, the U.S. Letters Patent No. 3,209,080 issued on September 28, 1965.[3]

During this same period Beltone was also developing a hearing aid with a frontally-directed microphone, and by the time Siemens' U.S. patent issued, Beltone had field tested its first accused hearing aid, had installed plant facilities for its production, had manufactured a substantial quantity of hearing aids for sale, and was preparing for public announcement of the product. Shortly after the patent issued, Beltone received from its patent counsel both a notification of the Siemens patent and an opinion that the purported invention described in the patent was not patentable in view of prior art and should not have received patent protection. Based upon this legal opinion and the fact that Beltone had committed substantial resources to the manufacture and sale of the first of the accused hearing aids, Beltone's long-standing plans for the public announcement of the introduction of its hearing aid went forward on November 1, 1965. Two introductory announcements occurred in the *National Hearing Aid Journal* of November, 1965, and *The Hearing Dealer* of December, 1965. Although copies of these journals were received at Siemens' office in December, 1965, and January, 1966, respectively, plaintiff admits knowledge of the Bel-

tone hearing aid only as of February, 1966. Interestingly, the publicity in *The Hearing Dealer* periodical appeared on the same page as a Siemens' advertisement for one of its front-focus hearing aids.

In November, 1963, during the pendency of Siemens' German and U.S. patent applications, suit was filed in Germany challenging Siemens' claim of sole inventorship of the device described in the patent applications. This litigation continued until September, 1967, when the inventorship issue was settled in plaintiff's favor.

Also, from the date of the initial German application, in May, 1961, until October, 1969, the German application was under examination for "novelty" by the German patent office. Siemens apparently successfully rebutted each citation of prior art made by the German examiner because in October, 1969, the application was published for purposes of permitting opposition. Publication brought two immediate oppositions from Bosch AG in November, 1969, any by Phillips AG, in December, 1969. These opposition proceedings continued into June, 1971, at which time the Bosch opposition was concluded in Siemens' favor and resulted in a cross-licensing agreement between those companies.[4]

Based upon the successful resolution of the inventorship issue and the Bosch opposition, both, of course, applying only to the German patent application, Siemens, for the first time, decided to approach U.S. firms believed to be infringing the U.S. patent, and to offer licenses under the patent. Beltone received this correspondence [5] on July 15, 1971, five

---

3. The details of the four-year prosecution before the U.S. Patent Office have not been called to the court's attention.

4. Siemens represents that, upon resolution of the Bosch opposition, it had "reason to believe" that the Phillips matter also would be terminated in its favor. Interestingly, there has been no specific indication to this court that the latter proceedings were ever terminated. However, elsewhere in the pleadings

it appears that European companies have taken licenses under the German patent.

5. The letter, sent on Siemens' counsel's stationery, stated that Siemens' U.S. patent had claims which were "at least broad enough in scope to cover" the hearing aids in question, and offered to discuss "the possibility of granting [Beltone] a non-exclusive license under [the] patent." This communication also warned that, if no license agreement

years and eight months after the introduction of its accused hearing aid. In reply, Beltone's counsel advised the attorneys for Siemens that a study of the patent would be undertaken and that, upon completion thereof, further communications would ensue. However, no further communication occurred between these parties until January, 1972, at which time a meeting was arranged between the companies' attorneys for March, 1972. At this meeting, Beltone's counsel stated that he considered Siemens' U.S. patent to be invalid, and any infringement claim to be precluded by the doctrine of laches. Again, no further communication passed between the parties after this meeting for nearly one year, when, in February, 1973, the instant litigation was commenced.[6]

In the years subsequent to Beltone's 1965 announcement of its original behind the ear, front-focus hearing aid, it developed four additional devices of this type and introduced them in June, 1966; October, 1969; September, 1970; and March, 1972, respectively. During the period from November 1, 1965, when Beltone's first accused hearing aid was introduced, to July 15, 1971, when Siemens sent Beltone the notice of infringement, defendant expended in excess of $500,000 in research and development costs, more than $350,000 in tooling costs, and in excess of $3 million in advertising and sales promotion, all attributable to the accused hearing aids. Further, the value of Beltone's inventory of the hearing aids in question as of July 15, 1971, exceeded $1 million, and, as of July 1, 1971, Beltone had obligated itself, through a long-term lease, to pay more that $700,000 for additional plant capacity in connection with the accused hearing aids.

The 19-month period between the initial notification of infringement and the filing of this suit saw further total expenses of approximately $1.5 million in research and development, tooling, and advertising for the devices in question. By the time of this suit, hearing aids worn behind the ear with a frontally-directed microphone were a "substantial segment" of Beltone's hearing aid business.

██ A claim may be barred under the doctrine of laches when a party is guilty of substantial and inexcusable delay in prosecuting his claim and such delay is prejudicial to the opposing party. Boris v. Hamilton Mfg. Co., 253 F.2d 526, 529 (7th Cir. 1958); Universal Coin Lock Co. v. American Sanitary Lock Co., 104 F.2d 781, 782 (7th Cir. 1939); Briggs v. Wix Corp., 308 F. Supp. 162, 169 (N.D.Ill.1969). Decisions on the issue of laches are addressed to the sound discretion of trial judges and are to be based upon the equities of the individual situations. Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1379 (7th Cir. 1972); Baker Mfg. Co. v. Whitewater Mfg. Co., 430 F.2d 1008, 1009 (7th Cir. 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 978, 28 L. Ed.2d 240 (1971); Boris v. Hamilton Mfg. Co., *supra,* 253 F.2d at 528; Universal Coin Lock Co. v. American Sanitary Lock Co., *supra.* Because the circumstances of each case inevitably differ, no case is an exact precedent for another. Baker Mfg. Co. v. Whitewater Mfg. Co., *supra,* 430 F.2d at 1011, *quoting,* Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 64 F.2d 185, 187 (3d Cir. 1933).

██ Most of the reported cases on laches in the patent context have in-

---

was reached, the law firm would recommend legal proceedings to halt the alleged infringement. In patent practice, a letter of this nature is referred ·to as a "notice of infringement".

**6.** Siemens represents that, between July, 1971, and February, 1973, it was corre-

sponding and conferring with representatives of several other U.S. firms believed to be infringing its U.S. patent. Evidently, no licensing or other arrangements of any kind were executed because Siemens concluded, after these efforts, that it would be necessary to file suit to vindicate its patent rights.

volved delay in commencing suit after an initial notification of infringement. *See, e.g.,* Continental Coatings Corp. v. Metco, Inc., *supra;* Baker Mfg. Co. v. Whitewater Mfg. Co., *supra;* American Home Products Corp. v. Lockwood Mfg. Co., 483 F.2d 1120 (6th Cir. 1973) cert. denied, 414 U.S. 458, 94 S.Ct. 917, 39 L. Ed.2d 110 (1974); Rome Grader & M. Corp. v. J. D. Adams Mfg. Co., 135 F.2d 617 (7th Cir. 1943); Brennan v. Hawley Products Co., 182 F.2d 945 (7th Cir. 1950). Where this period exceeds the applicable six-year period set forth in the statute of limitations, 35 U.S.C. § 286,[7] or can otherwise be deemed unreasonable, injury to the defendant is presumed and the burden is upon the plaintiff to excuse the procrastination. See, *e.g.,* Baker Mfg. Co. v. Whitewater Mfg. Co., *supra,* 430 F.2d at 1009–1013 (reviewing cases).

In this case, if the delay is to be measured from the date that Siemens first learned of Beltone's accused hearing aids to the date this suit was commenced, a period of exactly seven years, the delay may be deemed unreasonable as a matter of law.

Plaintiff contends that it has offered sufficient evidence to preclude a finding that the delay was inexcusable, or, at least, to raise a genuine issue of fact on the excuse issue. This evidence consists essentially of the affidavit of the Siemens patent engineer who prepared the German and U.S. patent applications, prosecuted the German application, and assisted in the presentation of the U.S. patent application. He states that, in view of the unsettled status of Siemens' German application from 1961 until 1971, *i. e.,* the inventorship litigation and the Bosch and Phillips opposition proceedings, a strategic decision was made not to attempt to enforce the corresponding U.S. patent rights until these rights had been clearly established through successful resolution of the attacks made upon the German patent ap-

plication. The relevance of the German proceedings to the U.S. patent is explained by affiant's belief that the German patent office subjects applications to the most thorough examination on the question of novelty, and his observation that, when American firms are charged by German companies with infringing the latter's U.S. patents, the American companies habitually refer to the German examination proceedings. Siemens also asserts that it would not have commenced this suit to enforce its U.S. patent rights if it had been unsuccessful in Germany.

The existence of patent litigation, often complex, lengthy, and expensive in nature, is, of course, one of the factors which must be considered and which may, in appropriate circumstances negate a laches defense. However, the mere existence of other proceedings does not by itself excuse a delay in commencing suit, even less does it justify a total failure to notify an alleged infringer that suit is being contemplated and would be instituted depending upon the outcome of a related patent contest.

The Seventh Circuit has not been disposed favorably to the "other litigation" defense to the laches doctrine. See Baker Mfg. Co. v. Whitewater Mfg. Co., *supra,* 430 F.2d at 1014–1015; Anchor Stove & Range Co. v. Montgomery Ward & Co., 114 F.2d 893, 894–895 (7th Cir. 1940). For example, in *Baker,* plaintiff argued that the pressure of defending two patent suits precluded it from handling additional litigation, and, thus, should have been deemed sufficient to excuse his delinquency in suing defendant. The Court of Appeals rejected this contention in language peculiarly appropriate here:

> "It does not explain why Baker remained silent from 1957 to 1962, *a five year period.* It is unrealistic to believe that Baker became so involved in other litigation that it could not file a suit against [defendant] for in-

---

7. Thus, in any event, Siemens could not recover damages for any infringement by Beltone occurring prior to February 2, 1967.

fringement and depend upon a court to give it such time to prepare and try its case as circumstances might justify. It certainly could have found time in 1962, as it could have in any of the proceding [sic] five years, to notify [defendant] that it was pressing [or intended to press] its claim of infringement." *Id.* (emphasis added).

This court can perceive no determinative distinction between judicial proceedings raising the issue of a patent's validity and specialized administrative proceedings involving the same question.

In this case, prompt notification to Beltone would have informed the accused infringer that a suit against it might be filed. A number of avenues by which defendant could have protected itself would have been opened. Beltone could have brought a declaratory judgment action under 28 U.S.C. § 2201 if the delay in waiting for the termination of the German administrative and judicial proceedings would have been burdensome. See, *e. g.*, American Home Products Corp. v. Lockwood Mfg. Co., *supra*, 483 F.2d at 1123.[8] Notification also may have prompted Beltone to undertake an immediate re-evaluation of its earlier conclusion that Siemens' "invention" was unpatentable and may have led defendant to modify its production plans for the hearing aids in question.[9] Any subsequent decision by Beltone to proceed with its original models would have been made with full knowledge of the risk of litigation involving those products and the company could have taken steps to mitigate any losses at-

tendant upon an adverse result in such a suit. *Id.* at 1124. See also Anchor Stove & Range Co. v. Montgomery Ward & Co., *supra*, 114 F.2d at 895. Thus, notice would have been an important factor in Beltone's subsequent enlargement of its accused line of hearing aids and the concomitant financial and material investment.

Siemens not only confesses knowledge of the first accused Beltone hearing aid in 1966 [10] but admits that it concluded after an examination of the device in the same year that the hearing aid "constituted a substantial copy" of the Siemens' product.

Siemens also admits in its memorandum that, as early as the termination of the inventorship litigation in 1967, it "believed it had *full title and right to the invention claimed* in the German patent application and thus *in the corresponding U.S. patent* . . . ." (Emphasis added.) This belief was held even though the German patent office still was examining the application for novelty. Over two years intervened between the conclusion of the inventorship challenge and the Bosch and Phillips oppositions. No assertion is made that litigation in the U.S. was economically impossible at any time; in any event, such a claim would be insufficient. Whitman v. Walt Disney Productions, Inc., 263 F. 2d 229, 231 (9th Cir. 1958).

Curiously, despite Siemens' concern over the status of its patent rights, the fact remains that plaintiff persisted in the U.S. application during this period, even though the inventorship question

---

8. The Seventh Circuit early held that an accused was under no obligation to pursue this remedy. Brennan v. Hawley Products Co., 182 F.2d 945, 949 (7th Cir. 1950). See Baker Mfg. Co. v. Whitewater Mfg. Co., *supra*, 430 F.2d at 1013. To impose this responsibility would shift to an alleged infringer the burden of taking affirmative action, contrary to the rule in this circuit requiring a patentee to justify delay.

9. If such a re-evaluation resulted in a different conclusion as to the validity of Siemens' patent, Beltone may have focused its manufacturing efforts upon non-infringing hearing

aids, or sought a license from plaintiff. See Rome Grader & M. Corp. v. J. D. Adams Mfg. Co., *supra*, 135 F.2d at 619.

10. Any contention that Siemens was unaware of Beltone's hearing aids would hardly seem supportable in light of Beltone's extensive advertising and promotion scheme. A party is charged with such knowledge as a reasonable investigation in the circumstances would have disclosed. See Pearson v. Central Ill. Light Co., 210 F.2d 352, 356–357 (7th Cir. 1954) ; Briggs v. Wix Corp., *supra*, 308 F. Supp. at 170.

was unresolved, and began to accuse U. S. firms while one of the opposition proceedings was still pending and unresolved.

Moreover, Siemens' U.S. patent was firmly established. It had been duly issued by the U.S. Patent Office after a presumably thorough four-year examination and prosecution before that agency. No controversy existed concerning it.

Nor can Beltone be charged with any fault. So far as the record indicates, defendant was unaware of the various extended German proceedings. But, even this knowledge on Beltone's part would not aid Siemens. As the court in *American Home Products* stated, "knowledge of the other litigation is not the important factor"; the critical point is forewarning of the intention to file suit. 483 F.2d at 1124.

█ In sum, considering the applicable delay to be that between the date that Siemens first learned of Beltone's original accused hearing aids and the date suit was commenced, plaintiff's dereliction was both unreasonable and inexcusable, and has not been adequately explained.

█ Assuming, however, that the applicable time frame for purposes of the laches defense is the five and one-half year period between plaintiff's first knowledge of Beltone's marketing of possibly infringing products and the notice of infringement, a period shorter than the statute of limitations, and, thus, raising no presumption of injury to defendant, it is clear that defendant has shown considerable prejudice from the delay.

The multi-million dollar development, promotion, and expansion of that portion of Beltone's business devoted to the

accused hearing aids is "the kind of change of position which will support the defense of laches." Continental Coatings Corp. v. Metco, Inc., *supra*, 464 F.2d at 1378. In this regard, the classic and oft-cited statement by the court in Westco-Chippewa Pump Co. v. Delaware Elec. & Supply Co., *supra*, is particularly applicable here:

"[A] uniform principle runs through all the cases. They proceed on the theory that the plaintiff knows his rights and has had ample opportunity to establish them in the proper forum; that, because of delay, the defendant has good reason to think that the plaintiff believes his asserted rights to be worthless or that he has abandoned them. . . .

"The question of laches then assumes the aspect of plaintiff having stood by and having done nothing to protect its rights . . . while the defendant was building up a business, which it thought was legitimate, and spending money in constructing a large plant." *Id.*, 64 F.2d at 187.

See Rome Grader & M. Corp. v. J. D. Adams Mfg. Co., *supra*, 135 F.2d at 619; Universal Coin Lock Co. v. American Sanitary Lock Co., *supra*, 104 F.2d at 783; Brennan v. Hawley Products Co., *supra*, 182 F.2d at 948.

The reliance which Beltone placed upon plaintiff's silence is manifest in the written response defendant's counsel made to the infringement notice. In that correspondence, Beltone's attorney noted that the infringement letter "came as a complete surprise" in view of the long period during which it and a number of other manufacturers had been marketing hearing aids worn behind the ear with a frontally-directed sound receiver.[11]

11. The pertinent portions of the letter read as follows:

"First, we must inform you that your letter came as a complete surprise to our client since Beltone has been marketing hearing aids with a frontally directed sound receiving opening and means transmitting sound waves from that opening through sound conducting channel to a microphone since at least 1964. If your client Siemens was in the hearing aid business at that time, and we believe that they were, we are certain that they had knowledge of such Beltone hearing aids and we are at a complete loss to understand why Siemens, if it believes that it

Plaintiff's delinquency in commencing suit or sending an appropriate notification could reasonably have been deemed by Beltone to confirm the earlier opinion of its experienced patent counsel that Siemens' U.S. patent had been improperly issued. Westco-Chippewa Pump Co. v. Delaware Elec. & Supply Co., *supra.* Siemens' claim that Beltone went forward because of its belief that the patent was invalid, rather than on the presumption that plaintiff had forsaken its patent rights, overlooks this very point.

From the foregoing, it is clear that equitable considerations justify precluding Siemens from recovering damages for any past infringement. However, the question remains whether plaintiff is foreclosed from prospective relief.

■ To bar plaintiff from injunctive remedies, it must be for the reason that "the patent right itself was extinguished. . . . Extinguishment of the patent right must be because [plaintiff is] estopped under the evidence to assert [its] rights." George J. Meyer Mfg. Co. v. Miller Mfg. Co., 24 F.2d 505, 508 (7th Cir. 1928).

Many of the factors which have entered into the foregoing decision on the question of laches are also relevant to the estoppel issue. However, the parties have only tangentially, if at all, addressed this particular point. A finding that plaintiff is precluded from asserting his rights with respect to future infringements would, in light of this court's decision on the laches defense, preclude plaintiff from relief altogether. In light of the severity of that result, this court deems it inappropriate to render a decision on the estoppel question without being fully briefed on the matter. Thus, a decision on this issue will be reserved until such time as this court

has a proper infringement charge, delayed so many years before calling this patent to our attention."

*Compare* American Home Products Corp. v. Lockwood Mfg. Co., *supra,* 483 F.2d at 1124, where the court took particular note of the fact that defendant did not include a patent dispute in a list of threatened litigation compiled for an intervening purchaser of its assets, even though the seller was aware of patent infringement litigation between the two other major companies in the relevant market, but had not received any notice of the patentee's intent to institute suit against it.

receives further argument on this topic at a time to be set by the court upon motion.

Accordingly, it is the judgment of this court, after careful consideration of the undisputed facts and the applicable precedent, and after due exercise of its equitable discretion on the facts before it, that defendant's motion for summary judgment should be granted to the extent of precluding Siemens from recovering damages for any past infringement but that the motion should be denied to the extent that it seeks dismissal of the entire action.